JOLICOEUR FURNITURE
CO., INC., et al.

v.

Charles C. BALDELLI et al.

No. 93–143–Appeal.

Supreme Court of Rhode Island.

Feb. 6, 1995.

Robert G. Flanders, Jr., Robert Karmen, Flanders & Medeiros, Providence, for plaintiff.

Lauren Jones, Caroline Cole Cornwell, Jones Associates, Marc DeSisto, DeSisto Law Offices, Providence, for defendant.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of the city of Woonsocket, Charles C. Baldelli, N. David Bouley, and Albert Brien (defendants) and on the cross-appeal of Jolicoeur Furniture Co., Inc., and James Zagrodny (plaintiffs) from a judgment of the Superior Court that ordered the defendants City of Woonsocket, Charles C. Baldelli, and N. David Bouley to pay compensatory damages plus interest, ordered Charles C. Baldelli and N. David Bouley to pay punitive damages, and awarded attorneys' fees and expenses to the plaintiffs. We affirm in part and reverse in part.

## FACTS

The facts, insofar as pertinent to the appeals, follow.

Beginning in 1946, Donald and Violet Schafrath (the Schafraths) owned and operated Jolicoeur Furniture Co., Inc. (Jolicoeur), a retail furniture store on the corner of Bernon and Front Streets in the city of Woonsocket, Rhode Island. James Zagrodny (Zagrodny), the owners' nephew, began to work at the store full time around 1969 and, by the mid–1980s, began to manage the store in anticipation of the Schafraths' retirement.

In April 1984, the Schafraths learned that the State of Rhode Island intended to acquire the site of the furniture store in order to reconstruct the Bernon Street Bridge, and consequently Zagrodny sought alternative locations for the store. After rejecting suggestions by the State Department of Transportation (DOT), Zagrodny contacted the city of Woonsocket for assistance in finding a location. In February 1985, Joel D. Mathews (Mathews), then the director of the Department of Planning and Development (DPD), suggested three contiguous lots, Nos. 291, 155, and 154, a short walk from Jolicoeur's old location and strategically located on Armory Street within the "hub" of the city's commercial and business district. Two of the lots, Nos. 291 and 155, were owned by the city, whereas the third, lot No. 154, was privately owned. Because no single lot could accommodate a new store, Zagrodny testified that this site would only have been acceptable if he were able to obtain all three lots.

Mathews sent a letter dated May 29, 1985, to the Woonsocket City Council (council), suggesting that the city sell city lot No. 155 to Jolicoeur and noting that such a sale should be contingent on Jolicoeur's acquisition of the privately owned lot No. 154. Mathews further recommended that such a sale be approved by the council and be conditioned on the DPD's approval of the plans for the site to ensure that the new store was "in harmony with the other buildings in [the] downtown location."

On October 7, 1985, the council passed an amendment to an ordinance authorizing "the

City Treasurer * * * to sell at public auction to the highest responsible bidder * * * real estate * * * designated as follows: Lot 155 * * * [$11,000]. Portion of Lot 291 * * * $5,600. * * * Said [lots] shall be sold as a singular package." The sale was conditioned on "the submittance and approval of all plans by the Department of Planning & Development and the obtainment of all permits as required to implement the bidder's proposal." The auction took place on November 26, 1985. Zagrodny submitted the highest bid and attempted to tender a bank check to the city treasurer for the full purchase price, but the city treasurer informed Zagrodny that approval of the sale by the council was required before the deeds to the lots could be transferred.

On the next day Zagrodny tendered a check for $1,500 to the city treasurer and presented a letter that conditioned Jolicoeur's acceptance of the sale offer on Jolicoeur's ability to purchase lot No. 154 from its private owner. The letter also stated that city-owned lot No. 155 should be restored to its original condition as it existed prior to the construction of the Bernon Street Bridge. Zagrodny's proviso referred to an easement taken by the DOT on lot No. 155, which easement was scheduled to expire on April 2, 1986. The city treasurer accepted Jolicoeur's deposit check (referred to by Zagrodny as a "binder" in his letter) and forwarded the results of the auction along with the conditions listed by Zagrodny to the council.

On January 21, 1986, the council enacted City Ordinance Chapter 4500 (ordinance 4500), authorizing the city treasurer to sell to Zagrodny as a single package lot No. 155 for $11,000 and a portion of lot No. 291 for $5,600 "upon payment in cash or certified check." The sale was to be conditioned upon the "submittance and approval of all plans by the Department of Planning & Development," and the parcels were to be conveyed subject to any easements.

Ordinance 4500 did not, however, specify the nature and extent of the plans that were required, nor did the ordinance provide standards or guidelines to govern the DPD's approval of any submitted plans. Mathews, nevertheless, told Zagrodny that the DPD's standard would be whether the building proposed by the plans would be in harmony with the surrounding area, and Zagrodny testified that he understood the ordinance to mean that "the City was protecting themselves [sic] from letting anybody put up any particular type of building that they [sic] wanted." The ordinance mandated no time limits, deadlines, or temporal restrictions within which Zagrodny was required to fulfill the conditions set forth in the ordinance. The ordinance was signed by Charles C. Baldelli (Baldelli), mayor of Woonsocket (mayor), on January 24, 1986.

Initially, the city had refused to sell the property as long as the DOT held the easement for storage of equipment on lot No. 155. Baldelli wrote to the DOT on September 3, 1986, concerning the easement on lot No. 155 (mistakenly referred to as "Lot 55" in the mayor's letter): "For your information, *legally binding agreements were entered into by the City and Jolicoeur Furniture to sell this land* for the purpose of the construction of a new Jolicoeur Furniture Showroom and Warehouse at this location. Unfortunately, this cannot take place because of the 'snafu' surrounding this extended easement." (Emphasis added.)

In November 1986 a more serious problem than the DOT easement arose when the Rhode Island Department of Environmental Management (DEM), in a letter dated November 5, 1986, informed the mayor that DEM had just learned of the sale of the land to Zagrodny. The very land that the city had agreed to sell to Jolicoeur was the subject of a State of Rhode Island Heritage Bond Grant awarded to the city of Woonsocket for the construction of the proposed River Island Park project. The DEM found the situation unacceptable and requested that the mayor's staff meet with DEM and suspend further action on conveying the land until the matter was resolved.

In addition to the letter, DEM also informed the DPD that if the city proceeded with its sale of the land to Jolicoeur, the state would not fund the Heritage Bond Grant that had been given to the city for construction of the park. The DEM also insinuated that if the sale were consummat-

ed, in addition to not funding the grant, DEM would use such a sale as leverage to deny further grants to the city. Thus, the sale of this land to Jolicoeur jeopardized not only the funding for River Island Park, but future funding for other parks and recreational areas as well. The DPD brought this potential threat to Woonsocket's continued receipt of state funds to the attention of the council and recommended that the council appease DEM because the DPD felt that the long-term benefits of the park to the city far outweighed those of the furniture store.

In response to this new development, Baldelli recommended that the city return the binder tendered by Zagrodny. Baldelli publicly stated that the sale of the land to Zagrodny was a "snafu" that he intended to correct immediately because of his commitment to the park.

On June 1, 1987, the council passed, and Baldelli signed, an amendment to ordinance 4500, the ordinance that had originally authorized the sale of land to Zagrodny. The amendment provided that the "authorization to sell shall expire 60 days after the passage of this ordinance unless [Zagrodny] shall have submitted to the Department of Planning & Development acceptable building design plans and obtained from the Zoning Board of Review necessary variances." The sixty-day deadline expired on August 25, 1987. On June 2, Zagrodny and his architect met with Nancy Brittain (Brittain) of the DPD. At this meeting, Zagrodny and Brittain discussed the placement of the building, its type, and certain concessions the DPD wanted Zagrodny to make concerning the park. Brittain gave Zagrodny and his architect a list of ten "suggestions" for the property, none of which was listed in the ordinance. These "suggestions" included having Zagrodny install lighting to prevent vandalism, landscape the green area, share parking and an entrance with the park, and create a buffer between the property and the park. Brittain's list also included "suggestions" that the building have a brick facade and wooden window frames and be placed as far from park as possible.

On August 20, 1987, the new director of the DPD, N. David Bouley (Bouley), wrote to the council that he had met with Brittain, Zagrodny, and Zagrodny's architect twice and had met with Zagrodny and Baldelli once. Bouley recommended that the city give Jolicoeur more time to submit acceptable plans while the parties continued to meet, although he expressly reserved the right to enforce the August 25, 1987 deadline if Zagrodny did not continue to recognize that the city was under no obligation to extend the deadline.

Approximately one week before the deadline, Zagrodny again met with Brittain and submitted a drawing to her. Brittain felt that these plans were not sufficient for the city planner to make a decision on whether to approve the building, and another meeting on August 25 failed to settle the matter. Despite the passage of the deadline date, the DPD did not call a halt to the process because it "didn't want to deadline then [sic] if [Zagrodny was] really diligently working on plans." Bouley testified that the letter of August 20, 1987, to the council administratively extended the deadline and that he had mailed a copy to Zagrodny. By September 1987, however, the DPD began to take the position that the deadline had expired and that the matter was, at that point, resolved because they had seen no new plans. The mayor's office took an identical position and wrote to the council that because the sixty-day deadline had passed, Zagrodny should be held in default and his right to buy the land be forfeited.

Some members of the council disagreed, however, and arranged a "workshop" to which the DPD and Zagrodny were invited. The council instructed Zagrodny to submit his plans to the city's zoning board (the board) for its approval of a variance for the site, and the board subsequently unanimously approved Zagrodny's application.

The council met on November 16, 1987, shortly after the board approved Zagrodny's variance. At that meeting, the council again amended ordinance 4500 to allow Zagrodny until December 31, 1987, to submit acceptable building plans to the design-review board, an entity that was part of the city government and related to the DPD. The

design-review board had not previously been part of the approval process.

Although Zagrodny did submit plans to the design-review board, Baldelli vetoed the November 16, 1987 amendment before the design-review board could reject or accept the plans. The mayor's veto message on December 9, 1987, explained that he had taken this action on the basis of his belief that the city was no longer under any obligation to sell the land to Jolicoeur because of Zagrodny's failure to fulfill the "contingent requirements of the initial agreement within the prescribed period of time." The council sustained the mayor's veto by one vote.

At some point in December 1987, Zagrodny attempted to submit the plans approved by the zoning board to Bouley, who "threw them right out the door" and told Zagrodny to "pick them up on [his] way out." During the same month, Zagrodny attempted to tender payment for the site to Albert Brien (Brien), the financial director for the city of Woonsocket. Brien did not accept Zagrodny's tender, whereupon Zagrodny obtained legal counsel and began the process that has culminated before this court.

## PROCEDURAL HISTORY

On December 24, 1987, plaintiffs filed suit against defendants in Superior Court and, pursuant to Rule 65 of the Superior Court Rules of Civil Procedure, obtained a temporary restraining order enjoining defendants from, inter alia, selling, encumbering, or otherwise alienating any interest in lot No. 155 and a portion of lot No. 291. The plaintiffs' complaint alleged (1) that all defendants breached a contract for the sale of land between the city and plaintiffs, (2) that defendants Baldelli and Bouley tortiously interfered with plaintiffs' contract with the city, (3) that defendants Baldelli and Bouley tortiously interfered with plaintiffs' advantageous business relationship with the city, (4) that all defendants violated 42 U.S.C. § 1983 (Federal Civil Rights Act) for abridging plaintiffs' constitutionally protected property and contractual rights, and (5) that the city violated the impairment-of-contracts and just-compensations clauses of the State and Federal Constitutions.

In October 1988, the Superior Court granted plaintiffs' Rule 42(b) motion for a bifurcated trial and directed that the issues of liability and specific performance be tried by the court without a jury and that the issue of damages be tried before a jury. On July 31, 1989, the Superior Court justice found that "a binding legal contract * * * [existed] between the City and Jolicoeur Furniture Company which is to be complied with within a reasonable time subject only to the submission of plans to the Department of Planning and Development." Sometime between July 31 and December of 1989, plaintiffs complied by submitting plans. In December 1989 plaintiffs moved for entry of judgment pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure, arguing that a final judgment on the issues that were already decided (1) would enable plaintiffs to obtain title and to use the property at issue, (2) would render a final judgment on the liability issue before expenses were incurred on a jury trial on the issue of damages, and (3) would simplify the jury trial by clarifying the issues already decided and by limiting the issues remaining. The Superior Court granted the motion and entered a judgment pursuant to Rule 54(b) on December 15, 1989, awarding plaintiffs "specific performance of the agreement to purchase Lot [No.] 155 and a portion of Lot [No.] 291 * * *." In addition, the judgment directed defendants to issue plaintiffs a building permit for the construction of a furniture store, forbade the application of the Design Overlay District ordinance to the properties at issue, voided the sixty-day deadline, voided other conditions imposed by defendants after the enactment of ordinance 4500, and voided all conditions related to the proposed park. Neither the city nor individual defendants appealed from this judgment.

In April 1992, following trial on the issue of damages, a jury found that plaintiffs had suffered monetary losses as a result of defendants' breach of contract and found that defendants Baldelli and Bouley had tortiously interfered with plaintiffs' contract. The jury further found, in response to interrogatories, that defendants city of Woonsocket, Baldelli, and Bouley had "violated plaintiffs' rights under the Federal Civil Rights Act; or [had

violated] * * * plaintiffs' constitutional rights." The trial justice dismissed plaintiffs' claim that defendants Baldelli and Bouley tortiously interfered with plaintiffs' advantageous business relationship with the city. The jury awarded to plaintiffs compensatory damages in the amount of $340,000 and punitive damages of $15,000 against each of defendants Baldelli and Bouley.

The plaintiffs' request for an award of attorneys' fees and costs based on the finding of 42 U.S.C. § 1983 violations and defendants' motion for a new trial and motion to alter or amend the judgment were heard in June and July 1992. The defendants moved to alter or amend the judgment either by a remittitur or by imposing conditions on the payment of damages to ensure actual construction of a furniture store. In response, the Superior Court awarded attorneys' fees to plaintiffs, denied defendants' motion for a new trial, and denied in part and granted in part defendants' motion to alter or amend the judgment. The trial justice refused the request for a remittitur but proceeded to place conditions on the payment of damages. In August 1992, the Superior Court entered a final judgment awarding plaintiffs (1) compensatory damages in the sum of $311,460 with interest, (2) increased construction costs in the amount of $28,540 with interest, provided that plaintiffs would begin and complete construction by certain dates, (3) punitive damages in the sum of $15,000 each from defendants Baldelli and Bouley, and (4) attorneys' fees and costs in the sum of $174,182.

Pursuant to G.L.1956 (1985 Reenactment) § 9-24-1, defendants appealed from the judgment, arguing that they were not subject to liability under 42 U.S.C. § 1983, that they were erroneously denied a jury trial on the breach-of-contract claim, that they did not violate any of plaintiffs' constitutional rights, that the jury instructions were prejudicial and erroneous, that defendants Baldelli and Bouley could not be held liable for tortious interference with the city's own contract, and finally, that the trial justice erroneously imposed interest upon the judgment. The defendants did not appeal any issue of state constitutional rights in respect to Baldelli's and Bouley's acts. The plaintiffs cross-appealed pursuant to § 9-24-1, contending that the trial court erroneously reduced the jury's award of compensatory damages and abused its discretion when it failed to base its attorneys' fees award on current billing rates or, alternatively, failed to add prejudgment interest to an award based on historic billing rates.

## DENIAL OF A JURY TRIAL

### I. The Rule 42(b) Order for Separate Trials

On appeal, defendants argued that on the breach-of-contract issue, they were erroneously denied their constitutional right to a jury trial as guaranteed by art. 1, sec. 15, of the Rhode Island Constitution. We disagree with defendants' conclusion.

■ Rule 38 subsections (a) and (b) of the Superior Court Rules of Civil Procedure provide that a party may demand a jury trial of any issue triable of right by a jury. This court has preserved a policy that favors jury trials and has required the determination of legal issues by a jury even in cases in which certain issues may be equitable. *Bendick v. Cambio*, 558 A.2d 941, 944 (R.I.1989). Once a trial by jury has been demanded, "the consent of *all* parties is required to waive a trial by jury on the issues demanded." *Blazar v. Perkins*, 463 A.2d 203, 207 (R.I.1983); Super.R.Civ.P. 38(d) and 39(a).

In the instant case, a jury trial was demanded by plaintiffs in their complaint and by defendants in their answer. Upon plaintiffs' Rule 42(b) motion for separate trials, the Superior Court issued an order in October 1988 stating that "[p]ursuant to Rule 42(b) of the Superior Court Rules of Civil Procedure, and *by agreement of the parties*," separate trials would be held "regarding the issues of liability and damages." The same order directed, *inter alia*, that the "issues of liability and specific performance, as requested in * * * plaintiffs' demand for judgment in the Verified First Amended Complaint shall be tried and decided by the Court, *without a jury*." (Emphases added.) In that demand for judgment, plaintiffs had requested a declaratory judgment that "defendants breached their agreement to sell and

convey the Property to plaintiffs." Thus, the very language of the order indicated that both parties had agreed to try the issues of liability and specific performance without a jury.

■ Furthermore, our careful review of the record disclosed no appeal by defendants of the October 1988 order, thereby providing further evidence of their consent to a nonjury trial on the issue of liability. Under Rule 4 of the Supreme Court Rules of Appellate Procedure, a notice of appeal must be filed within twenty days of the date of the entry of an order. The "all-important condition precedent for the taking of an effective appeal is that such appeal should be timely[,]" and "[t]his means that an appeal should be taken within twenty days of the entry of the * * * order * * * from which the appeal is taken." Joseph R. Weisberger, *Rhode Island Appellate Practice*, commentary 4.1 at 19 (1993). Moreover, appeals may be taken "only from final judgments or orders which have such an element of finality that action is 'called for before the case is finally terminated in order to prevent clearly imminent and irreparable harm.'" *Id.* (quoting *Lincoln v. Cournoyer*, 118 R.I. 644, 648, 375 A.2d 410, 412–13 (1977)); *see* § 9–24–1.

■ The October 1988 order of the Superior Court terminated the rights of both parties to a jury trial on the issues of liability and specific performance. Because a timely appeal was necessary in order to prevent the "imminent and irreparable" harm of being deprived of a jury trial on the issues, the order had the requisite "element of finality." Yet defendants failed to satisfy the "all-important condition precedent" of filing an appeal within twenty days of the entry of the order.

■ Because both defendants and plaintiffs consented to a trial of the liability issue without a jury, the requirement of an effective waiver under Rules 38(d) and 39(a) has been met; and because defendants did not file a timely appeal from the Rule 42(b) order, they are precluded from asserting that they were denied their right to a jury trial on the breach-of-contract issue.

## II. The Rule 54(b) Judgment

The defendants further argued that the Rule 54(b) judgment entered on December 15, 1989, by the Superior Court gave "no indication that a breach of contract had been found by the court" and that defendants were therefore prejudiced by the denial of a jury trial on that issue. The plaintiffs countered that the Rule 54(b) judgment was a final judgment on the breach-of-contract issue and that defendants' failure to appeal the judgment within the prescribed period bars them from raising the issue on appeal. We are of the opinion that the Rule 54(b) judgment in fact embodied a ruling on the breach-of-contract issue and properly awarded specific performance as a remedy.

■ At the December 14, 1989 hearing on the Rule 54(b) motion, the trial justice referred to "the breach, if it did take place—the breach took place obviously by the City—It's a question of when you're going to start itemizing the damages." In addition, the Rule 54(b) judgment entered on the following day unambiguously awarded plaintiffs "specific performance of the agreement to purchase Lot 155 and a portion of Lot 291 of Assessor's Plat 14." Specific performance, as a remedy, is "seldom granted unless there has been a breach of contract, either by nonperformance or by repudiation." *Restatement* (Second) *Contracts* § 357, comment (a) at 163 (1981); *see* 5A Arthur L. Corbin, *Corbin on Contracts* § 1141 (1964)("[i]n most cases in which a decree for specific performance has been granted * * * an actual breach by the defendant has already occurred"). The comments of the trial justice, coupled with the award of specific performance, plainly contradict defendants' contention that they were given "no indication that a breach of contract had been found by the court." And even if the above evidence were not conclusive, paragraph (5) of the Rule 54(b) judgment leaves no doubt that the breach-of-contract issue had been decided. After awarding plaintiffs specific performance and voiding certain conditions imposed by defendants, the trial justice in paragraph (5) of the judgment directed that "all issues of *liability* relating to Counts II, III, IV and V of the Verified First Amended

Complaint and all issues of *damages* relating to *all Counts* shall be tried before a jury on [date]." (Emphases added.) The inescapable conclusion from this paragraph is that the issue of *liability* in respect to *count 1* (that alleged a breach of contract by all defendants) had already been adjudicated in the bench trial. Thus, we conclude that the Rule 54(b) judgment provided ample notice to defendants that the breach-of-contract issue had been decided by the trial justice.

■ We note that both parties on appeal challenged whether the trial justice decided the issue of a breach of contract in the Rule 54(b) judgment. On its face, defendants' right to appeal the Rule 54(b) judgment appears to be time-barred by the fact that no notice of appeal was filed within twenty days of the entry of judgment on December 15, 1989. Sup.Ct.R. 4; § 9–24–1. However, in *Pearson v. Old Stone Savings Bank*, 119 R.I. 836, 383 A.2d 1029 (1978), where a party appealed from a Rule 54(b) judgment that decided the issue of liability and injunctive relief but reserved determination of the damages issue, this court held that the Rule 54(b) judgment was not ripe for appeal because it was "neither final nor [did] it fall within the narrow exceptions which permit appeal from interlocutory decrees." *Pearson*, 119 R.I. at 838–39, 383 A.2d at 1030. The test of finality of a judgment for purposes of appeal is that "it should terminate all litigation arising out of the cause between the parties on the merits[,]" and "if the judgment were affirmed, the court below should have only to execute the decree it had previously entered." *Id.* at 839, 383 A.2d at 1030. In *Pearson*, this court opined that because the Superior Court had reserved jurisdiction to determine the damages issue, it would have to undertake more than execution of its decree were this court to affirm the denial of the injunction. *Id.*

■ At the time the Superior Court entered the Rule 54(b) judgment in the instant case, "all issues of liability relating to counts II, III, IV and V of the Verified First Amended Complaint and all issues of damages relating to all Counts" were reserved for determination by a jury at a later date. Under *Pearson*, the breach-of-contract issue in this case was not final for purposes of appeal until all remaining issues of liability and damages were concluded.

■ Had the parties raised in this appeal the *merits* of the Superior Court's determination on the breach-of-contract issue, we would be constrained to conclude that the trial justice was correct in finding a breach of the contract for the sale of land by defendants. In light of the fact that the city, through its mayor, openly admitted that "legally binding agreements were entered into by the City and Jolicoeur Furniture to sell * * * land for the purpose of the construction of a new Jolicoeur Furniture Showroom and Warehouse[,]" we conclude that the trial justice was correct in finding that there was a binding legal contract between the city and plaintiffs. Finally, because land is "unique and distinctive," adequate compensation cannot be achieved through monetary damages, and an award of specific performance is an appropriate remedy in the breach of a contract for the sale of land. *Griffin v. Zapata*, 570 A.2d 659, 661–62 (R.I.1990).

Accordingly, we hold that defendants consented to a waiver of a jury trial on the breach-of-contract issue and that the Rule 54(b) judgment properly determined that defendants breached a legally binding contract.

### SECTION 1983 CLAIMS

■ On appeal, defendants argued that they were not subject to liability under 42 U.S.C. § 1983. " 'The very purpose of § 1983 was to interpose the * * * courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, "whether that action be executive, legislative, or judicial" '." *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 503, 102 S.Ct. 2557, 2561, 73 L.Ed.2d 172, 179 (1982). In our consideration of whether Baldelli and Bouley violated plaintiffs' constitutional rights and thus would be subject to liability under 42 U.S.C. § 1983, "it is not necessary for us to decide any question concerning the immunity of state * * * officials as a matter of federal law because * * * 'the first inquiry in any § 1983 suit is * * * whether the plaintiff has been deprived of a

right "secured by the Constitution and laws" of the United States. The answer to that inquiry disposes of this case." *Martinez v. California*, 444 U.S. 277, 284, 100 S.Ct. 553, 558, 62 L.Ed.2d 481, 488–89, *reh'g denied*, 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980). In other words, "[t]he first inquiry in any § 1983 suit * * * is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws'" of the United States. *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433, 439 (1979). All other issues are secondary to this determination.

The plaintiffs have alleged that defendants had taken their property without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution. After reviewing plaintiffs' claims, we have concluded that plaintiffs have failed to demonstrate that any of these actions have in fact risen to a level of constitutional deprivation. In analyzing claims under 42 U.S.C. § 1983 and the appropriateness of attorneys' fee awards under the related statute 42 U.S.C. § 1988, other State Supreme Courts have held that certain Fourteenth Amendment constitutional claims were not actionable under 42 U.S.C. § 1983 because they involved private rather than public rights. *See* 1 Steven H. Steinglass, *Section 1983 Litigation in State Courts* § 2.5(b)(3) (1992). In analyzing a 42 U.S.C. § 1983 condemnation claim and the associated denial of attorneys' fees under 42 U.S.C. § 1988, for example, the South Dakota Supreme Court stated:

> "As we review the cases indexed under section 1988, the rights being enforced are rights subject to 42 U.S.C. § 1983 actions, such as voting rights, jury discrimination, school desegregations and equal protection. * * * We do not view the appellees' claims as analogous claims. They are not taken to vindicate a broad public interest. Rather, they are taken to enforce a private property right. Counsel are not private attorney generals, but act as private counsel seeking substantial monetary damages

for their clients' injuries * * *. *Were we not to take such a view, every artful counsel could dress up his dog bite case as within sections 1983 and 1988.*" (Emphasis added.) *Boland v. City of Rapid City*, 315 N.W.2d 496, 503 (S.D.1982).

*See also Welsh v. City of Orono*, 355 N.W.2d 117, 124 (Minn.1984) (private nature of plaintiff's claim not "a fundamental civil rights issue," citing *Boland*); *Van Emmerik v. Montana Dakota Utilities Co.*, 332 N.W.2d 279, 284 (S.D.), *cert. denied*, 464 U.S. 915, 104 S.Ct. 278, 78 L.Ed.2d 257 (1983)(private property rights not within purview of 42 U.S.C. § 1988 awards of attorneys' fees).

■ In the case before us, the right claimed by plaintiffs does not affect a fundamental civil right "such as voting rights, jury or job discrimination, school desegregation, or the like." *Welsh*, 355 N.W.2d at 124 (award of attorneys' fees under 42 U.S.C. § 1988). "[N]or is plaintiff the member of a distinct, oppressed minority group. No injunctions were sought to stop illegal police practices, nor was the public interest vindicated in any way other than in the indirect manner of most common law * * * cases." *Boland*, 315 N.W.2d at 503 (quoting *Martin v. Hancock*, 466 F.Supp. 454, 456 (D.Minn. 1979)). The plaintiffs have merely stated private claims that address no public right or interest and that are actionable and compensable under state law. We therefore hold as a matter of law that defendants did not take plaintiffs' property in violation of "the Constitution and laws" of the United States. *Baker*, 443 U.S. at 140, 99 S.Ct. at 2692, 61 L.Ed.2d at 439.

■ The plaintiffs next asserted that they were deprived of their property rights without substantive due process. The plaintiffs are, of course, unable to claim a violation of procedural due process because, as noted above, an adequate postdeprivation remedy exists in the form of a common-law action. *See Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420, 431 (1981).[1]

---

1. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), held that because states could not often provide a meaningful predeprivation process in situations wherein the plaintiff

has suffered a loss of property as a result of a "random and unauthorized" act by a state employee, a meaningful postdeprivation hearing satisfied the requirements of the Fourteenth Amend-

Substantive due process, as opposed to procedural due process, addresses the "essence of state action rather than its modalities; such a claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible." *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir.1990). In *Amsden* the First Circuit noted that the standard purports to protect individuals against state actions that are "'arbitrary and capricious'" or that run counter to "'ordered liberty'" or that are "'shocking or violative of universal standards of decency'" or even "'too close to the rack and the screw'." *Id.* at 753–54. *See also Tenoco Oil Co. v. Department of Consumer Affairs*, 876 F.2d 1013, 1021 (1st Cir.1989)(noting a regulation that takes property violates the clause if it is arbitrary, discriminatory, or irrelevant to a legislative policy). The First Circuit concluded that, however phrased, "the constitutional line has been crossed" only when some basic and fundamental principle has been transgressed. *Amsden*, 904 F.2d at 754 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

We are of the opinion that, in this case, the constitutional line has not been crossed. "That one of the parties to the controversy is a governmental unit does not automatically convert a common law * * * action to a section 1983 claim." *Lillehaug v. City of Sioux Falls*, 788 F.2d 1349, 1352 (8th Cir.1986). Whatever the deficiencies in defendants' behavior, neither the city nor Baldelli nor Bouley acted in a manner that was in and of itself "egregiously unacceptable, outrageous, or conscience-shocking." *Amsden*, 904, F.2d at 754. Indeed, defendant city of Woonsocket clearly accommodated plaintiffs over a long period, attempting almost to the end to assist plaintiffs in reaching an acceptable solution to both parties' dilemmas. The city's activities could hardly be classified as "conscience-shocking," given its renewal of the deadline, the holding of a council "work-shop," and repeated accommodations to plaintiffs' lack of activity concerning submission of the building plans.

As for Baldelli and Bouley, DEM's threat and insinuation concerning Woonsocket's continued receipt of state funds placed those officials in an untenable and unenviable position, one that was probably exacerbated by plaintiffs' inactivity. Placed between the Scylla of loss of state funds and the Charybdis of violating the agreement with plaintiffs, that defendants fell into their course of action is not incomprehensible. We have considered plaintiffs' claim that defendants impaired their contractual obligations to plaintiff in violation of Art. 1, sec. 10, of the United States Constitution and conclude that it is without merit. We therefore hold that as a matter of law, defendants did not violate plaintiffs' right to substantive due process. Because plaintiffs have failed to demonstrate the threshold requirements of a 42 U.S.C. § 1983 claim, we hold as a matter of law that plaintiffs are not entitled to recover under 42 U.S.C. § 1983. *Trembley v. City of Central Falls*, 480 A.2d 1359, 1366–67 (R.I.1984). Consequently we vacate the award of attorneys' fees and the award of punitive damages against Baldelli and Bouley. Thus, the arguments on cross-appeal on the award of attorneys' fees and on the award of punitive damages are rendered moot. Because we have determined that plaintiffs' 42 U.S.C. § 1983 claim is invalid, we need not address defendants' purported immunity to such claims or defendants' charge that plaintiffs failed to prove that defendants' acts constituted a final official policy in accordance with *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

## TORTIOUS INTERFERENCE WITH CONTRACT

The defendants Baldelli and Bouley also asserted that the trial justice erroneously denied their motion for directed verdict in regard to plaintiffs' claim that they had tortiously interfered with plaintiffs' contract. After plaintiffs had rested, defendants moved

ment. *Id.* at 541, 101 S.Ct. at 1916, 68 L.Ed.2d at 432. Because we hold today that defendants are liable to plaintiffs under state common law,

the procedural requirements of the Due Process Clause are therefore satisfied.

for a directed verdict, arguing that there had been no third-party interference with the contract. The trial justice denied the motion. Again, after both sides had rested, defendants moved for a directed verdict, arguing once more that there had been no third-party interference with the contract between the city of Woonsocket and plaintiffs because Baldelli and Bouley were not third parties and had not acted outside the scope of their authority. Again the trial justice denied the motion.

The standard for granting a directed verdict under Rule 50 of the Superior Court Rules of Civil Procedure is well established in our case law. In reviewing the denial of a motion for a directed verdict, this court views all evidence in a light most favorable to the adverse party, draws all reasonable inferences from this evidence in a light most favorable to the adverse party, and refrains from weighing the evidence and passing on the credibility of witnesses. *Palmisciano v. Burrillville Racing Association*, 603 A.2d 317, 320 (R.I.1992). If there exist some issues upon which reasonable persons might draw conflicting conclusions, a motion for a directed verdict should be denied. *Id.*

In the instant case, the trial justice determined that reasonable minds could differ over the question of whether defendants Baldelli and Bouley tortiously interfered with the contract that existed between plaintiffs and the city of Woonsocket. The basic elements of a claim based on a tortious interference with a contractual relationship are "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional interference; and (4) damages resulting therefrom." *Smith Development Corp. v. Bilow Enterprises, Inc.*, 112 R.I. 203, 211, 308 A.2d 477, 482 (1973).

The elements of the tort have been established in this case. As explained *supra*, a legally binding contract existed between plaintiffs and defendant city of Woonsocket. In addition, the mayor admitted that "legally binding agreements were entered into by the City and Jolicoeur Furniture[,]" evidencing a knowledge of the contract on the part of Baldelli. Bouley's letter of August 20, 1987, also demonstrates knowledge of an existing contractual relationship between plaintiffs and the city in its reference to "the purchase of * * * land * * * previously agreed to." Next, Baldelli intentionally interfered with the contract by vetoing the November 16, 1987 amendment, thus nullifying the city council's extension of the deadline until December 31, 1987. Bouley intentionally interfered with the contract by refusing to consider plaintiffs' plans in December 1987. Lastly, plaintiffs suffered damages from this interference, discussed *infra*. Thus, the elements of the intentional tort of interference with contract were demonstrated by plaintiffs.

In their motions for directed verdict and again on appeal, however, defendants argued that Baldelli and Bouley—the mayor and the planning director, respectively, of the city of Woonsocket—could not be liable for a contract in which the city was a party.

"It is usually said that tort liability may be imposed upon a defendant who intentionally and improperly interferes with the plaintiff's rights under a contract with *another person* if the interference causes the plaintiff to lose a right under the contract or makes the contract rights more costly or less valuable." (Emphasis added.) W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 129 at 978 (5th ed. 1984). The question, therefore, is whether Baldelli, Bouley, and the city of Woonsocket can be considered the same party.

The city of Woonsocket's Home Rule Charter chapter 1, section 10, vests the legislative powers of the city in the city council. Chapter 4, section 2, however, directs that the mayor "shall be the chief *executive* and administrative officer of the city and shall be responsible for the administration and management of all *offices, departments, and agencies*." (Emphasis added.) Because these provisions have established separate branches of the city government, it is not inconceivable that the separate branches would be independent enough to act in opposition to one another in any number of ways. *See generally Goldwater v. Carter*, 444 U.S. 996, 997–98, 100 S.Ct. 533, 534, 62 L.Ed.2d 428, 428 (1979)(suit by members of Congress

against President); *Dellums v. Bush,* 752 F.Supp. 1141 (D.D.C.1990)(same). Additionally, numerous cases in the private sector have addressed the ability of an agent to interfere with the contract of the principal. *See* Thomas G. Fischer, Annotation, *Liability of Corporate Director, Officer, or Employee for Tortious Interference with Corporation's Contract with Another,* 72 A.L.R. 4th 492 (1989).

In *Roy v. Woonsocket Institution for Savings,* 525 A.2d 915 (R.I.1987), we considered a claim by a dismissed employee that his immediate superior had tortiously interfered with the employee's contractual relationship with his employer. *Id.* at 916–17. In that case we noted that in maintaining the cause of action, "[m]alice, in the sense of spite or ill will, is not required; rather legal malice—an intent to do harm without justification—will suffice." *Id.* at 919 (quoting *Mesolella v. City of Providence,* 508 A.2d 661, 669–70 (R.I.1986)).

Other state courts have addressed this issue as well. Illinois, for example, has recognized that a corporate officer may be held liable under a tort theory for unjustified interference with his or her corporation's own contract. *Swager v. Couri,* 77 Ill.2d 173, 190, 32 Ill.Dec. 540, 546, 395 N.E.2d 921, 927 (1979).

■ In the instant case, ample evidence demonstrated that Baldelli and Bouley intentionally interfered with the contract between the city and plaintiffs. "If [the] interference is found to be intentional and without justification, it is malicious in law even though it arose from good motives and without express malice." *Steranko v. Inforex, Inc.,* 5 Mass. App.Ct. 253, 273, 362 N.E.2d 222, 235 (1977), adopted by the Supreme Judicial Court of Massachusetts in *Gram v. Liberty Mutual Insurance Co.,* 384 Mass. 659, 429 N.E.2d 21 (1981). Although defendants here may have had good motives because of the potential loss of state funds to the city, they were not legally justified in their attempt to obstruct the successful completion of the contract between the city and plaintiffs. A legally binding contract existed between the city and plaintiffs, and Baldelli and Bouley acted tortiously to frustrate this agreement. Because their actions were not justified and constitut-

ed legal malice toward plaintiffs, their conditional privilege to act as agents of the city was destroyed. *See Lorenz v. Dreske,* 62 Wis.2d 273, 287, 214 N.W.2d 753, 760 (1974). Consequently, we find that the trial justice properly denied the motion of defendants Baldelli and Bouley for a directed verdict on the basis of abundant evidence upon which reasonable jurors could conclude that defendants acted with malice toward plaintiffs.

## THE JURY INSTRUCTIONS

The defendants also claimed on appeal that the instructions read by the trial justice to the jury were confusing to the panel, prejudicial to defendants, and erroneous in stating the law. The defendants argued that the instruction on tortious interference with contract did not reflect the correct standard, that the 42 U.S.C. § 1983 instruction was cryptic, that the punitive-damages instruction was biased, that the instruction on lost profits erroneously directed the jury to find them, and finally, that a cautionary instruction should have been given concerning a piece of evidence introduced at trial.

■ Because we have concluded that there were no deprivations of constitutional rights, the claims in regard to punitive damages and 42 U.S.C. § 1983 are moot. In regard to the other instructions, it is "axiomatic that the trial justice [is] obliged to instruct the jury with precision and clarity with respect to the rules of law applicable to the issues raised at trial." *Armstrong v. Polaski,* 117 R.I. 565, 568, 369 A.2d 249, 251 (1977). Our review of the record has persuaded us that the trial justice's instructions conformed to the standard. The facts and the legal issues in this case were complex. The jury instructions, therefore, by necessity reflected this reality. The trial justice's instructions demonstrated sufficient "precision and clarity," and, consequently, defendants' appeal on this issue is denied.

## REDUCTION OF COMPENSATORY DAMAGES AWARDED BY JURY

On cross-appeal, plaintiffs argued that the trial justice erred by subtracting $28,540 (the

increased construction costs claimed by plaintiffs) from the jury's compensatory damage award of $340,000 and by conditioning plaintiffs' recovery of the $28,540 on their starting and completing the construction of a new furniture store by certain dates.

At trial, plaintiffs submitted a summary of damages that listed seven items totaling $391,331, but the jury awarded plaintiffs only $340,000 in compensatory damages against all defendants. After trial, in response to defendants' motion to alter or amend the judgment, the trial justice amended the verdict by denying defendants' request for a remittitur but granting defendants' request to place conditions on plaintiffs' recovery of $28,540 in putative increased construction costs.

■■■■■ Public interest requires that jury verdicts possess a conclusiveness that will preserve the finality of the jury trial as an instrument for doing substantial justice. *Newport Fisherman's Supply Co. v. Derecktor,* 569 A.2d 1051, 1053 (R.I.1990)(quoting *Roberts v. Kettelle,* 116 R.I. 283, 300, 356 A.2d 207, 217 (1976)). For the same reason, judgments are "presumed to have been made up after careful deliberation" and are not to be disturbed without substantial reason. *Chase v. Almardon Mills, Inc.,* 102 R.I. 579, 581, 232 A.2d 390, 391–92 (1967)(quoting *Kolker v. Gorn,* 202 Md. 322, 325, 96 A.2d 475, 477 (1953)). We hold that if a trial justice cannot ascertain whether a particular item of damages was included in the jury verdict, the justice may not alter or amend the verdict by removing that item. *See Walker v. St. Laurent,* 103 R.I. 636, 639, 240 A.2d 414, 415 (1968)(in order to alter a confused, ambiguous, and inconsistent verdict, a trial justice must be able to say with certainty what the jury meant).

In this case, the jury award of compensatory damages in the amount of $340,000 was not itemized to reflect its component parts, nor was the jury questioned regarding its subtraction of $51,331 from the amount that plaintiffs claimed as damages. Although it is clear that the jury discounted that amount from the itemized list of damages submitted by plaintiffs, neither the trial justice nor this court can ascertain from the verdict which item or items the jury discounted. In the trial justice's opinion, five of the seven items listed by plaintiffs seemed "clear and concise" and the "only approximate items are the lost income and increased construction costs." Although the trial justice acknowledged the uncertainty over which item(s) the jury discounted by commenting that "[s]omewhere along the line they [the jurors] knocked off $50,000[,]" he proceeded to conclude that "[i]n the Court's opinion, the only area [the jurors] could knock it off is the lost income and profit."

■■■■ Even if we accept the trial justice's statement that five of the seven items were "clear and concise," there still remained the two "approximate items" of lost income and increased construction costs. Although the trial justice concluded that "the only area [the jurors] could knock it off is the lost income and profit[,]" nothing in the verdict suggests that the $51,331 was discounted from lost income rather than from increased construction costs. Because the trial justice's assumption that the jury award included increased construction costs was not discernable from the verdict, his decision to deduct the increased construction costs must be reversed. *Accord Krock v. Chroust,* 330 Pa.Super. 108, 112–15, 478 A.2d 1376, 1378–80 (1984)(where it was impossible to ascertain from the general verdict whether damages were awarded to compensate work loss or the decedent's pain and suffering, it was improper for the trial justice to mold the verdict by deducting the work-loss benefits).

■■■■ The trial justice could permissibly have conditionally corrected or modified the jury award by ordering a remittitur if the justice had concluded that the award was unreasonable in light of the evidence presented at trial. *Reccko v. Criss Cadillac Co.,* 610 A.2d 542, 545–46 (R.I.1992); *Cotrona v. Johnson & Wales College,* 501 A.2d 728, 733 (R.I.1985). A trial justice may not, however, reduce a jury award *without* using a remittitur. The trial justice in this case denied defendants' request for a remittitur, then impermissibly proceeded to reduce the jury award. Accordingly, we vacate items 1 and 2

of the amended final judgment and reinstate the original jury award of $340,000.

## PREJUDGMENT INTEREST

The defendants argued that because no express statutory provision permits recovery of interest against municipalities, the trial justice erred when he imposed prejudgment interest on the award of damages. We disagree.

General Laws 1956 (1985 Reenactment) § 9–21–10 provides for an award of interest "[i]n any civil action in which a verdict is rendered * * * for pecuniary damages * * * at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued." In *Aiello Construction, Inc. v. Nationwide Tractor Trailer Training and Placement Corp.*, 122 R.I. 861, 868–69, 413 A.2d 85, 89 (1980), this court held that § 9–21–10 applied to judgments in breach-of-contract actions and we have consistently ruled that plaintiffs may recover interest in breach-of-contract cases. *See Joni Auto Rentals, Inc. v. Weir Auto Sales, Inc.*, 491 A.2d 328, 329–30 (R.I.1985)(affirmed trial justice's award of interest under § 9–21–10 in a breach-of-contract claim); *North Smithfield Teachers Association v. North Smithfield School Committee*, 461 A.2d 930, 934 (R.I. 1983) (trial justice erred in failing to award interest in accordance with § 9–21–10 in a breach-of-contract case).

■ The defendants contended on appeal that the recovery of interest is not available because defendant city is a municipality. The cases relied upon by defendants for this proposition pertain exclusively to tort claims. We note that tort claims against the state and municipalities are governed by the Governmental Tort Liability Act, G.L.1956 (1985 Reenactment) chapter 31 of title 9, which specifically limits the amount of damages plaintiffs may recover in a *tort* action against the state, a city, or a town. Although plaintiffs in tort actions against the state or municipalities may need special legislative authority to recover interest on their judgments, *see, e.g. Cardi Corp. v. State*, 561 A.2d 384 (R.I.1989), we are of the opinion that plaintiffs in this case are entitled to recover interest in accordance with § 9–21–10.

■ We disagree, however, with the date from which interest should be calculated. The trial justice imposed interest from August 25, 1987, the deadline established by the city's amendment to ordinance 4500. The plaintiffs, however, did not comply with the conditions specified in the contract until a date in the second half of 1989. We have concluded that interest should be awarded from that date of compliance in 1989 to the date of this opinion.

In summary, we conclude that the defendants were not denied their right to a jury trial on the breach-of-contract issue and that the Rule 54(b) judgment properly determined by its award of specific performance that the defendants breached a legally binding contract. The defendants, however, did not infringe upon the plaintiffs' constitutional rights, and therefore, the awards of attorneys' fees and punitive damages are vacated. Because the defendants breached the contract and because Baldelli and Bouley tortiously interfered with plaintiffs' contract with the city of Woonsocket, damages in accordance with the jury award to the plaintiffs are granted in the amount of $340,000 in compensatory damages, plus interest from the date in late 1989 to be determined by the Superior Court on which plaintiffs fully complied with the terms of the contract until and including the date of this opinion. In regard to compensatory damages, the defendants are severally liable; we make no attempt to apportion damages but leave such a determination to the plaintiffs, who may seek the judgment from any or all defendants. The papers in the case may be remanded to the Superior Court for further proceedings in accordance with this opinion.