DECISION
Before the Court is Plaintiffs Care New England Health System, Women Infants Hospital of Rhode Island, Butler Hospital, Kent County Memorial Hospital, and Kent County Visiting Nurse Association d/b/a VNA of Care New England's (collectively, CNE) Partial Motion for Summary Judgment.[1] Also before the Court is Defendants The Rhode Island Office of the Health Commission and Health Insurance Commissioner Christopher F. Koller's (Commissioner Koller) (collectively, OHIC) Motion for Summary Judgment. The instant matter *Page 2 
arises out of OHIC's November 16, 2010 Final Order (OHIC-2010-5) (Final Order) — following an examination pursuant to G.L. 1956 §§ 27-13.1-1, etseq. (Examinations Statute) — which abrogated certain provisions contained within contracts between CNE and Blue Cross and Blue Shield of Rhode Island (Blue Cross) and imposed upon Blue Cross an administrative penalty of $5,000.
 I Background
As a preface, the Court will provide a brief survey of the legislative and statutory terrain encompassing OHIC and Blue Cross as it relates to the instant matter.
Blue Cross is a nonprofit hospital and medical service corporation incorporated pursuant to title 27, chapters 19, 19.2, and 20 of our General Laws. See Blue Cross/Blue Shield of R.I. v. State Dep'tof Bus. Regulation, No. 04-5769, 2005 WL 1530449, at * 7 (R.I. Super. June 23, 2005) (Silverstein, J.); see also BlueCross and Blue Shield of R.I. v. Caldarone,520 A.2d 969, 970 (R.I. 1987). Within the confines of this statutory scheme, Blue Cross is generally authorized to establish, maintain, and operate health plans for the purpose of providing medical and hospital services to its subscribers. Seegenerally, §§ 27-19-1(3); 20-1(4), (5), and (6).
In 2004, following a public controversy over the management of Blue Cross, the General Assembly enacted The Rhode Island Health Care Reform Act of 2004 — Health Insurance Oversight (the Act), G.L. 1956 §§ 42-14.5-1 through 42-14.5-3, creating OHIC within the Rhode Island Department of Business Regulation (DBR). See BlueCross and Blue Shield of R.I. v. McConaghy, No. PC 04-6806, 2005 WL 1633707, at *1 (R.I. Super. 2005). Under the Act, OHIC was endowed with specific regulatory powers and duties related to the health insurance industry in Rhode Island. Id. *Page 3 
In connection therewith, the General Assembly made the following legislative findings:
 "(1) A substantial amount of health care services in this state are purchased for the benefit of patients by health care insurers engaged in the provision of health care financing services or is otherwise delivered subject to the terms of agreements between health care insurers and providers of the services.
 "(2) Health care insurers are able to control the flow of patients to providers of health care services through compelling financial incentives for patients in their plans to utilize only the services of providers with whom the insurers have contracted.
 "(3) Health care insurers also control the health care services rendered to patients through utilization review programs and other managed care tools and associated coverage and payment policies.
 "(4) By incorporation or merger the power of health care insurers in markets of this state for health care services has become great enough to create a competitive imbalance, reducing levels of competition and threatening the availability of high quality, cost-effective health care.
 "(5) The power of health care insurers to unilaterally impose provider contract terms may jeopardize the ability of physicians and other health care providers to deliver the superior quality health care services that have been traditionally available in this state.
 "(6) It is the intention of the [G]eneral [A]ssembly to authorize health care providers to jointly discuss with health care insurers topics of concern regarding the provision of quality health care through a committee established by an advisory to the health insurance commissioner." Sec. 42-14.5-1.1.
The General Assembly endowed the health insurance commissioner with the following powers and duties:
 "(a) To conduct quarterly public meetings throughout the state . . . regarding the rates, services and operations of insurers licensed to provide health insurance in the state[,] the effects of such rates, services and operations on consumers, medical care providers, patients, and the market environment in which such insurers operate and efforts to bring new health insurers into the Rhode Island market. . . . *Page 4 
 "(b) To make recommendations to the governor and the house of representatives and senate finance committees regarding health care insurance and the regulations, rates, services, administrative expenses, reserve requirements, and operations of insurers providing health insurance in the state, and to prepare or comment on, upon the request of the governor, or chairpersons of the house or senate finance committees, draft legislation to improve the regulation of health insurance. . . . The commissioner shall also make recommendations on the levels of reserves including consideration of: targeted reserve levels; trends in the increase or decrease of reserve levels; and insurer plans for distributing excess reserves.
 "(c) To establish a consumer/business/labor/medical advisory council to obtain information and present concerns of consumers, business and medical providers affected by health insurance decisions. The council shall develop proposals to allow the market for small business health insurance to be affordable and fairer. . . .
 "(d) To establish and provide guidance and assistance to a subcommittee (`The Professional Provider-Health Plan Work Group') of the advisory council created pursuant to subsection (c) above, composed of health care providers and Rhode Island licensed health plans. . . .
 "(e) To enforce the provisions of [t]itle 27 and [t]itle 42 as set forth in § 42-14-5(d).
 "(f) To provide analysis of the Rhode Island Affordable Health Plan Reinsurance Fund. . . .
 "(g) To analyze the impact of changing the rating guidelines and/or merging the individual health insurance market as defined in chapter 27-18.5 and the small employer health insurance market as defined in chapter 27-50 . . ." Sec. 42-14.5-3.
The health insurance commissioner was authorized to discharge these powers and duties in order to:
 "(a) Guard the solvency of health insurers; (b) Protect the interests of consumers; (c) Encourage fair treatment of health care providers; (d) Encourage policies and developments that improve the quality and efficiency of health care service delivery and outcomes; and (e) View the health care system as a comprehensive *Page 5 
entity and encourage and direct insurers towards policies that advance the welfare of the public through overall efficiency, improved health care quality, and appropriate access." Sec. 42-14.5-2.
Also in 2004, the General Assembly enacted chapter 19.2 of title 27, entitled Nonprofit Hospital and Medical Corporations, which specifically addressed the administration of Blue Cross. In drafting the legislation, the General Assembly expressly found that it was in the best interest of the residents of Rhode Island:
 "(1) To strengthen and reform the governance structure of nonprofit hospital service and/or medical service corporations;
 "(2) To ensure a diverse, independent and publicly accountable board of directors;
 "(3) To prohibit certain activities which may allow self-interest to compromise undivided loyalty to the public interest mission for which such corporations were established; and
 "(4) To require adoption of principles and procedures to keep such corporations aligned with their public interest mission." Sec. 27-19.2-1.
For that reason, the General Assembly charged Blue Cross with the following mission statement:
 "(1) To provide affordable and accessible health insurance to insureds, including those persons insured by an affiliate or subsidiary of said plan;
 "(2) To assist and support public and private health care initiatives for individuals without health care insurance;
 "(3) To promote integration, efficiency and coherence of a statewide health care system that meets the needs of all Rhode Island residents;
 "(4) To contribute through its operations, procedures and investments to the improvement of medical and prevention services delivered in Rhode Island; and *Page 6 
 "(5) To provide affordable and accessible health insurance to a comprehensive range of consumers, including business owners, employees and unemployed individuals." Sec. 27-19.2-3.
In accordance with that mission, the General Assembly required Blue Cross to:
 "(1) Offer products in the small group;
 "(2) Offer products in the individual market, with at least one 30-day open enrollment period every twelve (12) months;
 "(3) Employ pricing strategies that enhance the affordability of health care coverage; and
 "(4) Protect the financial condition of the nonprofit hospital and/or medical service plan." Sec. 27-19.2-10.
 II Facts and Travel
CNE is a Rhode Island healthcare system comprised of Women Infants Hospital of Rhode Island, Butler Hospital, Kent County Memorial Hospital, and VNA of Care New England. See
Delmonico Aff. ¶ 3. Blue Cross is a taxable nonprofit corporation that contracts with healthcare providers to provide healthcare services to subscribers of its insurance plans.Id. ¶ 9.
In mid-2008, Blue Cross and CNE began renegotiating the terms of their 2004 participation agreements (2004 Agreements). See
Torti Aff. Ex. F, Rector Associates Report. Under the 2004 Agreements, Blue Cross was required to pay CNE "base rates for covered services related to commercial business, Medicare Advantage business, and Rite Care. The basis rates for those lines of business increased at various rates from January 1, 2005 through December 31, 2008." See id. CNE, however, dissatisfied with its level of reimbursement under the 2004 Agreements, entered the negotiations seeking a 30% increase of its reimbursement rate. See Delmonico Aff. ¶ 28. *Page 7 
On December 22, 2008, Blue Cross and CNE entered into contracts — effective as of January 1, 2009 and expiring December 31, 2013 — establishing the amended reimbursement rates payable by Blue Cross to CNE for services provided by CNE to Blue Cross's subscribers (Blue Cross Agreements).Id. ¶ 21. The Blue Cross Agreements renewed the 2004 Agreements for an additional five-year term, and while they left most of the substantive provisions intact, the parties included material changes to the calculation and amount of compensation to be received by CNE. See Torti Aff. Ex. F, Rector Associates Report.
Specifically, in lieu of the 30% rate increase originally sought, the parties compromised and agreed to a lower rate increase and a cash payment to CNE in exchange for the inclusion of a major adverse event provision (Challenged Provision). See Delmonico Aff. ¶¶ 23, 28. Under the Challenged Provision, three separate calculations are conducted annually for CNE — one for Medicare, one for Medicaid, and one for "other state/federal program."See Torti Aff. Ex. F, Examination Report ¶ 5. As to each of the three categories of government payors, CNE separately calculates "positive events," events that increase CNE's revenues or lower its costs, and then offsets the calculation with "adverse events," or events that decrease CNE's revenues or increase its costs.[2]Id. If any of these independent government payor calculations results in a negative result or shortfall — regardless of whether the calculations for the other two government payors result in positive events — Blue Cross is liable for a percentage of the shortfall for that payor. Id. Put another way, under this methodology, an "adverse event" for one government payor cannot be netted-out by "positive events" for the other two government payors.Id. *Page 8 
The Challenged Provision further provides that Blue Cross's liability shall vary depending on the magnitude of the shortfall up to $10,000,000. See Delmonico Aff. ¶¶ 25-26; see also
Supplemental Delmonico Aff. ¶¶ 5-9. And as to a shortfall in excess of $10,000,000, Blue Cross's liability is determined by a binding mediation.[3] Id.
On or about January 16, 2009, following concerns over the effect of the Blue Cross Agreements on Blue Cross's financial condition, OHIC issued an exam warrant to Blue Cross pursuant to the Examinations Statute. See Torti Aff. ¶¶ 2-4. The objective of OHIC's examination was two-fold: (1) to determine whether Blue Cross's actions were in compliance with applicable statutes and regulations; and (2) to evaluate the financial and market impact of the Blue Cross Agreements on Blue Cross. Id. ¶ 6.
Thereafter, Blue Cross notified CNE of the warrant and CNE subsequently contacted OHIC officials. On January 28, 2009, a meeting was held between CNE, Blue Cross, and OHIC to explain the purpose of the examination, describe the examination process, and to address CNE's concerns. Id. ¶¶ 5, 7-9. On February 9, 2009, CNE, Blue Cross, and Commissioner Koller executed a letter agreement (Letter Agreement) providing, interalia, that: (1) a new warrant addressing CNE's concerns over the original warrant would be issued pursuant to the Examinations Statute; (2) all papers obtained from Blue Cross during the examination would be treated as work papers and afforded confidentiality as provided by the Examinations Statute; (3) CNE would be invited and entitled to attend and participate in any public hearings relating to the Blue Cross Agreements; (4) CNE would be granted an opportunity to explain its position before the preparation of any report resulting from the examination; and (5) OHIC would hold the *Page 9 
contents of any final report private and confidential for a thirty-day period following the mailing of a copy to CNE.Id. ¶¶ 10-11; see also Torti Aff. Ex. D, Letter Agreement.
The Blue Cross examination was conducted by Joseph Torti, III, Deputy Director and Superintendent of Insurance for the DBR, and John Aloysius Cogan, Jr., Executive Assistant for Program and Policy Review at OHIC (collectively, Examiners) with assistance from Rector Associates, Inc. See Torti Aff. Ex. G, Final Order (OHIC-2010-5). On April 10, 2009, Laurie Briggs (Briggs), a Rector Associates consultant, emailed CNE's counsel to schedule a conference call on April 15, 2009 "to discuss [CNE's] contracts with Blue Cross[.]" See Torti Aff. Ex. E, April 10, 2009 email. Briggs indicated that the call was intended to be "CNE's opportunity to provide [them] with its perspective on the [Blue Cross] negotiations and the resulting contracts." Id. Additionally, Briggs sought information regarding: (1) the process by which CNE determines payment rates; (2) the factors that led to the inclusion of the Challenged Provision; and (3) how the provisions and rates agreed to by Blue Cross compare to those negotiated by CNE with other insurers. Id.
Over the next eighteen months, the Examiners proceeded with their investigation. See Torti Aff. ¶ 14. On October 12, 2010, the examination report was finalized, and on October 22, 2010, the Examiners made their recommendations and transmitted the verified exam (Examination Report) to Commissioner Koller and Blue Cross.Id. ¶¶ 15-16. As their final recommendations, the Examiners stated:
 "Given that Blue Cross is a creation of statute and is only authorized to write lines of insurance with respect to certain types of risk, specifically (1) health insurance; (2) stop-loss and catastrophic insurance; and (3) the types of insurance that may be provided by nonprofit dental service corporations, nonprofit legal service corporations, and nonprofit optometric service corporations, and is not authorized to write any other lines of insurance, it is difficult to see how Blue Cross's obligations under *Page 10 
the [Challenged Provision] do not exceed Blue Cross's statutory authority." See Torti Aff. Ex. F, Examination Report ¶ 4.
The Examiners further concluded that by "ceding ultimate control over the rates it pays CNE" and subjecting itself to the "open-ended nature of the [Challenged Provision]," Blue Cross had placed its reserves at risk and potentially jeopardized its solvency in violation of the statutory mandate to protect its financial condition. Id. ¶ 8. For these reasons, the Examiners ultimately recommended that Commissioner Koller order Blue Cross to: (1) disregard the Challenged Provision; (2) use its best efforts to renegotiate the Blue Cross Agreements in a manner consistent with its legal authority; and (3) refrain from agreeing to similar provisions. Id. ¶ 9. Additionally, the Examiners recommended that Commissioner Koller issue an administrative penalty against Blue Cross. Id.
Upon receipt of the Examination Report, Blue Cross was advised of its obligation to prepare and submit to OHIC a written submission or rebuttal with respect to any and all matters contained in the documents. See Torti Aff. Ex. G, Final Order ¶ 6. On November 8, 2010, Blue Cross filed its response. See OHIC'S Summ. J. Mem. Ex. B. Thereafter, Commissioner Koller considered and reviewed the Examination Report and recommendations, together with Blue Cross's written response and the relevant portions of the Blue Cross Agreements. See Torti Aff. Ex. G, Final Order ¶ 6.
On November 16, 2010, OHIC issued the Final Order, adopting the findings and recommendations[4] of the Examination Report and imposing an administrative penalty of $5,000. See Torti Aff. ¶ 17. Both the Examination Report and Final Order were sent to Blue Cross and CNE. Id. In his cover letter attaching the documents, Commissioner Koller indicated that (1) *Page 11 
the content of the Final Order would remain private and confidential for thirty days; (2) the Final Order was a final administrative decision appealable pursuant to Administrative Procedures Act, chapter 35, title 42; and (3) CNE should contact him with any questions regarding the documents or anything else addressed in the letter. See Torti Aff. Ex. G. Subsequently, Blue Cross informed CNE that it would no longer abide by the Challenged Provision. See Delmonico Aff. ¶ 37. Despite Commissioner Koller's request that CNE contact him to discuss any questions, OHIC was never contacted to discuss the matter or to resolve the issues raised in the Examination Report and Final Order. See Torti Aff. ¶ 18.
 III Standard of Review
Summary judgment is proper when, after reviewing the admissible evidence in a light most favorable to the non-moving party, "no genuine issue of material fact is evident from the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, and the motion justice finds that the moving party is entitled to prevail as a matter of law."Smiler v. Napolitano, 911 A.2d 1035, 1038 (R.I. 2006) (quoting Rule 56(c)). When considering a motion for summary judgment, "the court may not pass on the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." Westinghouse Broad.Co., Inc. v. Dial Media, Inc.,122 R.I. 571, 579, 410 A.2d 986, 990 (R.I. 1980) (internal citations omitted). During a summary judgment proceeding, "the justice's only function is to determine whether there are any issues involving material facts." Steinberg v. State,427 A.2d 338, 340 (R.I. 1981). Moreover, in passing upon a motion for summary judgment under Rule 56, if no genuine issue of material fact exists, the trial justice may determine "`whether the moving party is entitled to judgment under *Page 12 
the applicable law.'" Ludwig v. Kowal,419 A.2d 297, 301 (R.I. 1980) (quoting Belanger v. Silva,114 R.I. 266, 267, 331 A.2d 403, 404 (1975)). "When there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment is properly entered."Tangleridge Dev. Corp. v. Joslin,570 A.2d 1109, 1111 (R.I. 1990); see also Holliston Mills,Inc. v. Citizens Trust Co., 604 A.2d 331, 334 (R.I. 1992) (stating that "summary judgment is proper when there is no ambiguity as a matter of law").
 IV Discussion
CNE's challenge of OHIC's Final Order is essentially three-fold. CNE contends: (1) OHIC exceeded its statutory authority by abrogating a contract provision entered between CNE and Blue Cross; (2) OHIC failed to comply with the procedural requirements of the Administrative Procedures Act (APA), G.L. 1956 § 42-35-1, et seq.; and (3) OHIC abridged a property interest without affording adequate due process. For its part, OHIC seeks summary judgment as to all counts of CNE's Verified Complaint and asserts: (1) its actions were not ultra vires in light of its broad enforcement authority; (2) CNE was afforded the requisite due process; (3) OHIC complied with the provisions of the Examinations Statute and APA; and (4) CNE's claim for tortious interference with contract must fail as a matter of law. The Court will now address these claims in seriatim.
 A OHIC's Statutory Authority
CNE asserts that OHIC exceeded its statutory authority when it issued the Final Order, and therefore, seeks a declaration that the Final Order, with respect to the Challenged Provision, is of no legal force or effect. Conversely, OHIC maintains that as the governmental body *Page 13 
responsible for overseeing Blue Cross and guarding its solvency and financial condition, OHIC's actions were clearly within the statutory authority provided by titles 27 and 42, and Regulation 2 of the Office of the Health Insurance Commissioner (Regulation 2).
It is black-letter law that "[a]n administrative agency is a product of the legislation that creates it, and it follows that `[a]gency action is only valid, therefore, when the agency acts within the parameters of the statutes that define [its] powers.'"Iselin v. Ret. Bd. of Emps.' Ret. Sys. of R.I.,943 A.2d 1045, 1050 (R.I. 2008) (quoting In re Advisory Opinionto the Governor, 627 A.2d 1246, 1248 (R.I. 1993)). For that reason, CNE would have this Court read our statutory framework as endowing OHIC with only limited enforcement authority. The Court, however, does not believe that such a reading is in accord with the plain and clear language of our statutes or with the intent of the General Assembly.[5]
In Rhode Island, the General Assembly specifically conferred upon the health insurance commissioner the "sole and exclusive jurisdiction over enforcement" of matters relating to health insurance. See § 42-14-5(d). OHIC's enabling statute — chapter 14.5 of title 42 — specifies that *Page 14 
the health insurance commissioner is to "discharge [his] powers and [the] duties of office" to guard the solvency of health insurers and protect the interests of consumers. See § 42-14.5-2; seealso Regulation 2 §§ 5 6. Among those powers and duties, the health insurance commissioner is responsible for "enforc[ing] th[ose] provisions of [t]itle 27 and [t]itle 42" relating to health insurance. See § 42-14.5-2. In particular, "[i]t is the duty of the [health insurance commissioner] to make an examination of the financial condition and methods of doing business of every nonprofit hospital service corporation [such as Blue Cross] . . . in accordance with all of the provisions of [the Examinations Statute]." Sec. 27-19-9.
Although CNE would limit OHIC's authority under the Examinations Statute to merely a determination of whether a company is in compliance with applicable laws and regulations, the plain language grants the health insurance commissioner broad enforcement and regulatory authority.[6] See,e.g., § 27-13.1-3(a) ("The [health insurance commissioner] . . . may conduct an examination . . . of any company as often as the [health insurance commissioner] in his sole discretion deems appropriate. . . ."); § 27-13.1-3(b) ("[T]he [health insurance commissioner] may examine or investigate any person, or the business of any person, in so far as the examination or investigation is, in the sole discretion of the [health insurance commissioner], necessary or material to the examination of the company."); § 27-13.1-4(c) ("The [health insurance commissioner] . . . shall have the power to issue subpoenas, to administer oaths, and to examine *Page 15 
under oath any person as to any matter pertinent to the examination."). Indeed, in those instances where an "examination report reveals that the company is operating in violation of any law, regulation, or prior order of the [health insurance commissioner]," Commissioner Koller is specifically authorized to "order the company to take any action the [health insurance commissioner] considers necessary and appropriate to cure the violation." Sec. 27-13.1-5(c)(1).
Furthermore, our General Laws, similarly authorized Commissioner Koller's levy of an administrative penalty. Pursuant to § 42-14-16(a), whenever the health insurance commissioner has "cause to believe that a violation of title 27 and/or chapters 14, 14.5, 62 or 128.1 of title 42 or the regulations promulgated thereunder" has occurred, he or she is authorized to:
 "(1) Revoke or suspend a license; (2) Levy an administrative penalty in an amount not less than one hundred dollars ($100) nor more than fifty thousand dollars ($50,000); (3) Order the violator to cease such actions; (4) Require the licensee or person or entity conducting any activities requiring licensure under title 27 to take such actions as are necessary to comply with title 27 and/or chapters 14, 14.5, 62, or 128.1 of title 42, or the regulations thereunder; or (5) Any combination of the above penalties." Sec. 42-14-16(a).
Therefore, under the current statutory scheme, Commissioner Koller had a statutory duty to examine Blue Cross's financial condition and methods of doing business and to protect its solvency. Moreover, titles 27 and 42 undoubtedly provided Commissioner Koller with the statutory authority to not only impose an administrative penalty, but also to issue an order requiring Blue Cross to take those actions he deemed necessary and appropriate.
Consequently, based on the plain and unambiguous language of titles 27 and 42, as well as Regulation 2, the Court finds no basis for CNE's assertion that Commissioner Koller did not have the statutory authority to conduct an examination or issue an order nullifying the Challenged Provision and ordering the parties to renegotiate. OHIC conducted an examination *Page 16 
to address concerns over the Challenged Provision's effect on Blue Cross's financial condition and the potential impact on health insurance affordability, accessibility, provider fairness, and other regulatory objectives; thus, it was free to order Blue Cross, based on its findings, to undertake those actions deemed necessary and appropriate to remedy the violation. For that reason, the Court: (1) finds that OHIC's actions were not in excess of its statutory authority; (2) rejects CNE's attempt to read the language of OHIC's enabling statute and the Examinations Statute in a manner nullifying the Final Order; and (3) grants OHIC's motion for summary judgment as to this claim.[7]
 B Due Process Claims
The due process clauses of the United States and Rhode Island Constitutions "`provide[] heightened protection against government interference with certain fundamental rights and liberty interests.'" State v. Germane, 971 A.2d 555, 583 (R.I. 2009) (quoting Washington v. Glucksberg, 521 U.S. 702, 720 (1997)). Procedural due process ensures that notice and an opportunity to be heard precede any deprivation of a person's life, liberty, or property.[8] Moreau *Page 17 v. Flanders, 15 A.3d 565, 587-88 (R.I. 2011) (citingGermane, 971 A.2d at 574) (internal citations omitted);see also Board of Regents v. Roth,408 U.S. 564, 569-70, 92 S. Ct. 2701, 2705 (1972) (stating that procedural due process requires some kind of hearing prior to the deprivation of a constitutionally protected property interest).
The protections of procedural due process, however, are not triggered unless a party can show that it has been deprived of a protectable liberty or property interest as defined by an independent source such as state law. See Moreau,15 A.3d at 588 (citing Morrissey v. Brewer,408 U.S. 471, 481, 92 S. Ct. 2593, 2600 (1972)) (affirming that a court will determine what process is due only after a determination that a legitimate property or liberty interest exists); see alsoSalisbury v. Stone, 518 A.2d 1355, 1360 (R.I. 1986) (citingRoth, 408 U.S. at 569, 92 S. Ct. at 2705) (asserting that a party must establish a "legitimate claim of entitlement" to demonstrate a property interest). Therefore, a party alleging "`a deprivation of due process rights must demonstrate that either a property or liberty interest[,] clearly protected by the due process clause[,] was divested . . . without [adequate] procedural safeguards.'" Bradford Assocs. v. Rhode Island Div. ofPurchases, 772 A.2d 485, 489 (R.I. 2001) (quotingSalisbury, 518 A.2d at 1360).
 1 Administrative Procedures Act
According to CNE, OHIC's Final Order violated a protected interest arising under the APA. In particular, CNE asserts that the APA's statutory scheme, requiring OHIC to provide notice and an opportunity to be heard before issuing final orders in contested cases, forms the *Page 18 
basis for its due process claim. For its part, OHIC maintains that the APA's procedural requirements relating to "contested cases" are inapplicable to the instant matter and directs the Court to the procedural requirements set forth in the Examinations Statute itself.
It is well settled that "[p]rotected interests in property are normally `not created by the Constitution. Rather, they are created and their dimensions are defined' by an independent source such as state statutes or rules entitling the citizen to certain benefits."Goss v. Lopez,419 U.S. 565, 572-73, 95 S. Ct. 729, 735 (1975) (quotingRoth, 408 U.S. at 577, 92 S. Ct. at 2709); see also URIStudent Senate v. Town of Narragansett,631 F.3d 1, 11 (1st Cir. 2011) (affirming that a constitutionally protected property interest rests on a right or status conferred by state law, not merely on the complaining party's unilateral expectations). It follows therefore, that the APA admittedly may, under certain circumstances, form the basis of a party's legitimate claim of entitlement. Id.
Here, however, CNE's claim of entitlement arising under the APA fails for two reasons. First, in order to implicate the procedural protections of § 42-35-9 — and claim a protected interest thereunder — CNE must have been a party to a "contested case."See § 42-35-9 ("[I]n any contested case, all parties shall be afforded an opportunity for hearing after reasonable notice."). To qualify as "contested case," the APA provides that a hearing be required by law before a party's legal rights are affected.See § 42-35-1(3) ("[A] proceeding, including but not restricted to ratemaking, price fixing, and licensing, in which the legal rights, duties, or privileges of a specific party are required by law to be determined by an agency after an opportunity for hearing."); see also Pine v. Clark,636 A.2d 1319, 1325 (R.I. 1994) (holding that a proceeding did not fall under the APA's definition of a contested case and the APA's judicial review section was inapplicable where a hearing was not required by law). Given that CNE was *Page 19 
not a party to OHIC's examination and that the Examinations Statute does not require a hearing where an examination report has been adopted, the Court finds as a matter of law that the instant matter cannot possibly qualify as a contested case.[9]
Second, CNE's claim of entitlement under the APA is simply inconsistent with the plain language of the Examinations Statute. Indeed, when conducting an examination, adopting an examination report, or issuing a final order, the Examinations Statute itself — not the APA — dictates the requisite procedural safeguards owed to a party.[10] Seegenerally, §§ 27.13.1-4,-5. It is only upon the issuance of a final order by the health insurance commissioner, that a party's right to invoke the APA is even implicated.See § 27-13.1-5(d)(1) ("Any order shall be considered a final administrative decision and may be appealed pursuant to the [APA]. . ."). Moreover, the procedural safeguards of the Examinations Statute are only afforded to the *Page 20 
examined company, and CNE — a nonparty to the examination — may not now claim any entitlements to due process.See, e.g., § 27-13.1-5(b) ("Upon receipt of the verified report, the department shall transmit the report to the company examined, together with a notice that shall require the company examined to file . . . a written response to all comments and recommendations contained in the examination report. . . . In lieu of these requirements, the company may submit a rebuttal to any comment or recommendation contained in the examination report."); § 27-13.1-5(c) ("If the examination report reveals that the company is operating in violation of any law, regulation . . . the director may order the company to take any action the director considers necessary and appropriate to cure the violation."); § 27-13.1-5(d)(1) ("Any order shall be considered a final administrative decision and may be appealed pursuant to the [APA], and shall be served upon the company . . ."); § 27-13.1-5(d)(2) (setting forth the procedures for a non-adversarial confidential investigatory proceeding between the health insurance commissioner and the examined company). Consequently, in light of the foregoing, the Court finds as a matter of law that CNE is not entitled to the procedural protections of either the Examinations Statute or § 45-35-9 of the APA, and for that reason, the Court denies its claim for due process thereunder.
 2 The Blue Cross Contracts Letter Agreement
The second basis for CNE's due process claim is premised on its alleged vested property interest arising under the Blue Cross Agreements. CNE contends that OHIC issued the Final Order without providing it with adequate notice or a hearing, and consequently divested CNE of its vested contractual rights without due process of law. OHIC maintains, however, that Blue Cross lacked the statutory authority to enter into the Challenged Provision, and as a result, the *Page 21 
Blue Cross Agreements are void ab initio. Moreover, OHIC asserts that even assuming the existence of a valid contract, CNE was afforded the requisite notice and opportunity to be heard.
It is axiomatic that the "liberty" or "property" interests protected by due process need not always flow from state law or the Constitution. Roth, 408 U.S. at 577, 92 S. Ct. at 2709. Rather, a private contract may create a legitimate claim of entitlement sufficient to implicate the protections of due process.Lynch v. U.S., 292 U.S. 571, 579, 54 S. Ct. 840, 843 (1934). Accordingly, CNE maintains that its vested right to enforce the obligations of the Blue Cross Agreements was a protectable interest within the purview of due process.
OHIC, however, has previously determined that the Challenged Provision was an illegal insurance obligation and that Blue Cross exceeded its statutory authority by entering into the Blue Cross Agreements.[11] In view of those determinations, the Court finds that the Blue Cross Agreements are ultra vires
contracts — having been made in violation of Blue Cross's well-defined and limited statutory powers — and therefore, are voidab initio. See Resolution Oversight Corp. v. Kansas HealthCare Stabilization Fund,38 Kan. App. 2d 899, 905, 175 P.3d 268, 273 (Kan. App. 2008) (explaining that to the extent an entity enters into a contract exceeding the scope of its statutory authority, the contract is unlawful, unenforceable, and void); St. Charles County v. A JointBd. or Comm'n, 184 S.W.3d 161, 166 (Mo. App. 2006) (quotingDonovan v. Kansas City,352 Mo. 430, 440, 175 S.W.2d 874, 879 (1943)) (stating that "`[a] contract of a corporation which is ultra vires . . . [or] beyond the powers conferred upon it by the General Assembly[,] is not voidable only, but wholly void, and of no legal effect'"). Accordingly, CNE can assert no rights or entitlements under the Blue Cross Agreements and thus, its due process claim must fail. See Kells v. Town ofLincoln, 874 A.2d 204, 209-10 (R.I. 2005) *Page 22 
(implying that a contract in contravention of state statute is illegal and no contractual rights are created thereunder);Power v. City of Providence, 582 A.2d 895, 900 (R.I. 1990);see also State Dep't of Bus. Regulation, 2005 WL 1530449, at * 7 (emphasizing that there can be no protectable interest without a valid contract).
Moreover, CNE can point to no other legitimate claims of entitlement or protectable interests that were deprived by the Final Order. Rather, without the benefit of the Blue Cross Agreements to serve as the basis of its due process claim, the terms of the Letter Agreement must consequently govern CNE's entitlement, if any, to notice and an opportunity to be heard. Under the Letter Agreement, CNE had a legitimate expectation that it would be provided with: (1) an opportunity to address the Blue Cross Agreements before the preparation of any report resulting from the examination; (2) a copy of any portion of the examination report to be made public following the entry of an order adopting the report; and (3) the right to attend any public hearing related to the examination and to participate in any portion of the hearing related to the Blue Cross Agreements.[12] See Torti Aff. Ex. D, Letter Agreement. A review of the evidence, however, indicates that CNE was afforded all the procedural protections previously agreed to and more.
Indeed, on January 28, 2009, CNE was initially invited to a meeting with Blue Cross and OHIC to explain the purpose of the examination, describe the examination process, and to address CNE's concerns. See Torti Aff. ¶¶ 5, 7-9. During the examination, OHIC organized a teleconference with CNE to discuss the Blue Cross Agreements and obtain information and CNE's perspective on: (1) the process by which CNE determines payment rates; (2) the factors that led to the inclusion of the Challenged Provision; and (3) how the provisions and rates agreed *Page 23 
to by Blue Cross compared to those negotiated by CNE with other insurers. See Torti Aff. Ex. E, April 10, 2009 email; seealso Briggs Aff. ¶¶ 4-5. Finally, at the conclusion of the examination, both the Examination Report and Final Order were sent to CNE, and Commissioner Koller instructed CNE to contact him with any questions regarding the documents or anything else addressed in his cover letter. See Torti Aff. Ex. G, Final Order. Therefore, having been afforded all the procedural protections agreed to, the Court finds as a matter of law that CNE was not been divested of any contractual rights, and accordingly, due process was not implicated.
In light of the foregoing, the Court finds as a matter of law that CNE did not possess a protected interest under the APA or the Blue Cross Agreements, and for that reason, the entry of the Final Order was not a violation of its due process rights. Moreover, the Court is of the opinion that any obligation to provide CNE with notice and an opportunity to be heard arose solely from the Letter Agreement; and based on the proffered evidence, the Court finds those obligations to have been adequately satisfied.
 3 42 U.S.C. § 1983
In Count II of its Verified Complaint, CNE invokes the equitable powers of 42 U.S.C. § 1983 and requests that this Court enjoin OHIC and Commissioner Koller from depriving it of its constitutional rights. 42 U.S.C. § 1983 provides:
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ." *Page 24 
The purpose of § 1983 is to "`interpose the courts between the [s]tates and the people, as guardians of the people's federal rights.'" Jolicoeur Furniture Co., Inc. v. Baldelli,653 A.2d 740, 749-50 (R.I. 1995) (quoting Patsy v. Board ofRegents of Fla., 457 U.S. 496, 503, 102 S. Ct. 2557, 2561 (1982). As guardians, the courts are to "`protect the people from unconstitutional action under color of state law, whether that action be executive, legislative, or judicial.'" Id.
In practice, § 1983 creates "`a species of tort liability'" in favor of persons who are deprived of `rights, privileges, or immunities secured' to them by the Constitution." See Carey v.Piphus, 435 U.S. 247, 253 (1978) (quoting Imbler v.Pachtman, 424 U.S. 409, 417, 96 S. Ct. 984, 996 (1976)). Therefore, "[t]he first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right `secured by the Constitution and laws'" of the United States. Baldelli,653 A.2d 740, 749-50 (R.I. 1995) (quoting Baker v. McCollan,443 U.S. 137, 140, 99 S. Ct. 2689, 2692 (1979)). Here, however, where the Court has previously determined that CNE was not deprived of any due process rights, the answer to that inquiry unquestionably disposes of this claim as a matter of law. Accordingly, the Court grants OHIC's motion for summary judgment thereto.
 C Tortious Interference with Contract
Although not initially briefed, as the gravamen of its claim for intentional interference with contract, CNE argues that by ordering Blue Cross not to make any payments under the Challenged Provision and requiring Blue Cross to use its best efforts to renegotiate the Challenged Provision, OHIC, by way of the Final Order, intentionally and wrongfully interfered with the Blue Cross Agreements. However, OHIC asserts that without a valid contract between Blue Cross and CNE, there can be no basis for a tortious interference claim. Moreover, *Page 25 
assuming arguendo that a cognizable contract existed between the parties, OHIC avers that CNE has failed to demonstrate an improper purpose.
To prevail on a claim of tortious interference with contractual relations, a plaintiff must establish "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his [or her] intentional interference; and (4) damages resulting therefrom." Tidewater Realty, LLC v. State,942 A.2d 986, 993 (R.I. 2008). Additionally, our Supreme Court has clarified that mere intentional interference will not suffice; rather, a party's interference must have been improper.Id. (citing Avilla v. Newport Grand Jai Alai, LLC,935 A.2d 91, 98 (R.I. 2007)); see also Baldelli,653 A.2d 740, 753 (R.I. 1995) (explaining that although a showing of improper interference does not require evidence of actual malice, a party, a minimum, must establish an intent to do harm without justification).
While a determination of improper interference is undoubtedly a question of fact not ordinarily ripe for determination on a motion for summary judgment, in light of the Court's prior determination that the Blue Cross Agreements were void ab initio, the Court need not reach such a determination to dispose of CNE's claim. Indeed, without a valid contract, CNE cannot, as a matter of law, satisfy the elements of its tortious interference claim, and therefore, the Court must grant OHIC's motion for summary judgment as to this claim.
 V Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court finds, as a matter of law, that OHIC was acting within its statutory authority when it conducted an examination of Blue Cross and issued the Final Order nullifying the Challenged Provision, requiring the parties to renegotiate, and imposing an administrative *Page 26 
penalty. Moreover, the Court finds that CNE was not deprived of a protected interest under either the APA or the parties' private contracts, and thus, due process was not implicated. For that reason, the Court grants OHIC's motion for summary judgment as to Counts I, II, III, IV, V, and VI.[13]
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] CNE filed a six-count Verified Complaint with claims for: (1) injunctive relief (Count I); (2) relief under 42 U.S.C. § 1983 (Count II); (3) declaratory judgment as to OHIC's statutory authority (Count III); (4) declaratory judgment as to its due process rights (Count IV); (5) an Administrative Procedures Act violation (Count V); and (6) tortious interference with contract (Count VI).
[2] "Adverse event" is broadly defined as "(i) Federal and/or State actions which directly reduce the net patient revenue collectively of CNE . . . and its affiliates . . . (collectively `CNE Total System'); or (ii) Federal and/or State actions which directly increase expenses to CNE Total System. See Torti Aff. Ex. F, Examination Report ¶ 7.
[3] On December 24, 2009, CNE notified Blue Cross of certain MAEs requiring Blue Cross to increase its base rates. See Delmonico Aff. ¶ 30. Since that time, CNE and Blue Cross have attempted to resolve the pending claims and determine whether a pro rata rate increase is necessary. Id. ¶ 31.
[4] Commissioner Koller adopted the Examination Report, its findings and conclusions, and the recommendations of the Examiners with the exception of Recommendation 9. See Torti Aff. Ex. G, Final Order.
[5] The Court's determination is tempered by our well-settled canons of statutory construction. To ascertain a statute's meaning, the Court is mindful that its ultimate goal is to give effect to the General Assembly's intent. See State v. Graff,17 A.3d 1005, 1010 (R.I. 2011) (quoting Martone v. Johnston Sch.Comm., 824 A.2d 426, 431 (R.I. 2003)). Where, as here, the language of the statute "`is unambiguous and expresses a clear and sensible meaning, there is no room for statutory construction or extension, and [the Court] must give the words of the statute their plain and obvious meaning. . . . Such meaning is presumed to be the one intended by the Legislature. . . .'" McGuirl v. Anjou Int'lCo., 713 A.2d 194, 197 (R.I. 1998) (quoting WayneDistrib. Co. v. Rhode Island Comm'n for Human Rights,673 A.2d 457, 460 (R.I. 1996)); see also Steinhof v. Murphy,991 A.2d 1028, 1036 (R.I. 2010) (quoting State v. Germane,971 A.2d 555, 574 (R.I. 2009)) (affirming that "`[w]hen interpreting a statute, [the Court's] ultimate goal is to give effect to the General Assembly's intent. . . . The best evidence of such intent can be found in the plain language used in the statute. Thus, a clear and unambiguous statute will be literally construed.'"). It is only in those instances where the Court ascertains "`an actual ambiguity in the statute, not one styled by skilled attorneys'" that the Court will "`employ our well-established maxims of statutory construction in an effort to glean the intent of the Legislature.'" Town of Burrillville v. Pascoag Apartment Assocs.,LLC, 950 A.2d 435, 445 (R.I. 2008) (quoting UnistrutCorp. v. State Dep't of Labor Training,922 A.2d 93, 98-99 (R.I. 2007)).
[6] Similarly, under Regulation 2, the health insurance commissioner, upon a determination that "any action or inaction by a health insurer could adversely affect the solvency or financial condition of that health insurer," may exercise any duty or power authorized by titles 27 or 42 and broadly act to guard the solvency and financial condition of a health insurer. See Regulation 2 § 5(b)(ii). Notably, when making a determination as to the solvency and financial condition of a health insurer, the health insurance commissioner is specifically authorized to "consider and/or act upon . . . a health insurer's transaction with affiliates, agents, vendors, and other third parties to the extent that such transactions adversely affect the financial condition of the health insurer." See id. § 5(c)(iv).
[7] In addition to challenging OHIC's statutory authority, CNE also challenges: (1) OHIC's findings relating to the Challenged Provision's impact on or threat to Blue Cross's solvency; (2) the necessity or propriety of the provisions of the Final Order; and (3) OHIC's determination that the Challenged Provision was anultra vires insurance obligation. Those findings, however, were made in connection with OHIC's examination and the issuance of its Final Order pursuant to the Examinations Statute. As such, they are not properly before the Court as this time. Indeed, the Examinations Statute provides that "[a]ny order shall be considered a final administrative decision and may be appealed pursuant to the Administrative Procedures Act, chapter 35 of title 42." Sec. 27-13.1-5. Here, CNE readily concedes that it was not a party to OHIC's examination and is not currently seeking an administrative appeal. For that reason, the Court rejects outright CNE's attempt to circumvent the procedural requirements of the Examinations Statute and APA in order to overturn the statutorily authorized actions and findings of an agency.
[8] The Due Process Clause of the Fourteenth Amendment provides that "no state shall . . . deprive any person of life, liberty, or property without due process of law." Correspondingly, Article 1, Section 2 of the Rhode Island Constitution states "[n]o person shall be deprived of life, liberty or property without due process of law." It is well settled, that because the Due Process Clauses of the United States and Rhode Island Constitutions are identical, the analysis under both clauses is the same. See RhodeIsland Depositors Econ. Prot. Corp. v. Brown,659 A.2d 95, 100 (R.I. 1995), cert. denied,516 U.S. 975, 116 S. Ct. 476 (1995)).
[9] Under the Examinations Statute, an investigatory hearing may be held only if the health insurance commissioner rejects the examination report and directs the examiners to reopen the examination for the purposes of obtaining addition information.See §§ 27-13.1-5(c)(1),-(c)(2). Any hearing shall be conducted as a non-adversarial confidential investigatory proceeding as necessary for the resolution of any inconsistencies, discrepancies, or disputed issues apparent upon the face of the filed examination report or raised by or as a result of the health insurance commissioner's review. See § 27-13.1-5(d)(2).
[10] Under the Examinations Statute, an examination report must be filed no later than sixty days following the completion of an examination. See § 27-13.1-5(b). Upon receipt of the report, a copy is mailed to the examined company, together with a notice requiring a response or rebuttal within thirty days to all comments and questions contained in the report. Id. Within thirty days of receiving the response, the health insurance commissioner considers and reviews the examination report, together with any responses or rebuttals and relevant portions of the examiner's workpapers, and enters an order: (1) adopting the examination report as filed or with modifications; or (2) rejecting the examination report and directing the examiners to reopen the examinations to collect additional information and to hold investigatory hearings.See § 27-13.1-5(c). If the adopted examination report reveals that the examined company is operating in violation of any law, regulation or prior order of the commissioner, the commissioner may order the company to take any action the commissioner considers necessary and appropriate to cure the violation. Id. All orders shall be accompanied by the director's findings and conclusions and shall be considered a final administrative decision, appealable pursuant to the APA. See § 27-13.1-5(d). All adopted examination reports are held as private and confidential for a period of thirty days, and thereafter opened for public inspection unless otherwise ordered by a court.See § 27-13.1-5(e).
[11] See supra note 7.
[12] Notably, no public hearings were held in connection with OHIC's examination of Blue Cross and the Blue Cross Agreements.
[13] Count I of CNE's Verified Complaint seeks an injunction preventing OHIC from, inter alia: (1) enforcing the Final Order; and (2) publishing or otherwise releasing to the public the Examination Report and Final Order containing confidential information concerning the Blue Cross Agreements. See Verified Complaint ¶ 58. In that connection, in view of the determinations contained herein, the Court denies the first prong of the injunctive relief sought by CNE. The Court, however, cannot so readily dispose of the second prong of the aforementioned request for relief. Rather, the Court is called upon to balance the equities and weigh the parties' right to confidentiality against the public interest in disclosure. Although the Court is keenly aware of the confidential nature of the provisions contained within the Blue Cross Agreements, the Court cannot simply disregard the General Assembly's intent. The General Assembly created OHIC to: (1) guard the solvency of health insurers; (2) protect the interests of consumers; (3) encourage fair treatment of health care providers; (4) encourage policies and developments that improve the quality and efficiency of health care service delivery and outcomes; and (5) direct insurers towards policies that advance the welfare of the public through overall efficiency, improved health care quality, and appropriate access. See § 42-14.5-2. Consistent therewith, the Court declines to enjoin the release of the Examination Report and Final Order and leaves the matter in the hands of Commissioner Koller. *Page 1